# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>STEWARD HEALTH CARE SYSTEM,<br>LLC, *et al.*,<br>     Debtors.[1] | Chapter 11<br><br>Case No. 24-90213 (CML)<br>(Jointly Administered) |
| Dr. Manisha Purohit, Dr. Diane Paggioli,<br>Dr. James D. Thomas, Dr. Thomas Ross,<br>Dr. Michael Regan, Dr. Peter Lydon,<br>Dr. Sridhar Ganda, and Dr. A. Ana Beesen,<br>for themselves and those similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>Steward Health Care System LLC,<br>IASIS Healthcare, LLC, and<br>Patrick Lombardo, in his role as Executive<br>Vice President for Human Resources for<br>Steward Heath Care System LLC; and<br>John and Jane Does, in their roles as<br>Committee Members and/or Management<br>Board Members,<br><br>    Defendants. | Misc. No. _____ |

# EMERGENCY MOTION FOR AN ORDER
# STAYING HEARING ON TURNOVER MOTION

Movants Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr.

Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda and Dr. A. Ana Beesen, participants in and

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

beneficiaries of certain deferred compensation plans (the "**Deferred Compensation Plans**" or the "**Plans**") sponsored by the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") , on their own behalf and on behalf of other participants in the Deferred Compensation Plans (collectively, "**Movants**" or the "**Participants**"), by and through their undersigned counsel, move this Court, under Rule 5011(c) and (d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to stay all proceedings in the contested matter created by the *Debtors' (I) Motion for an Order (A) Directing the Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets (C) Authorizing Termination of the Trusts, and (D) Granting Related Relief; and (II) Objection to Dr. Manisha Purohit's Letter* [Case No. 24-90213, Dkt. No. 3277] (the "**Turnover Motion**," and the contested matter created thereby, the "**Contested Matter**") filed by and the objection filed by the Participants in relation thereto [Case No. 24-90213, Dkt. No. 3497] ("**Turnover Objection**") pending resolution by the District Court of the Participants' Motion to Withdraw the Reference (as defined below) of the Adversary Proceeding[2] (as defined below) and, whether or not the reference is withdrawn, pending adjudication of the Adversary Proceeding. In support of this Motion, the Participants state as follows:

## JURISDICTION AND VENUE

1.      The District Court has original jurisdiction over the Debtors' chapter 11 cases pursuant to 28 U.S.C. § 1334(b).

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

3.      The predicate for the relief sought herein is Bankruptcy Rules 5011(c) and (d).

## PROCEDURAL HISTORY

---

[2] Copies of all of the various relevant pleadings identified in this Emergency Motion have been filed with this Court as exhibits to the Declaration of Christopher Johnson in support of and filed substantially contemporaneously with this Emergency Motion.

4.      This Motion arises in the context of the chapter 11 bankruptcy cases of Steward Health Care System, LLC *et al.*, currently pending in the United States Bankruptcy Court for the Southern District of Texas, case no. 24-90213 (collectively the "**Bankruptcy Case**"), and the class action filed by the Participants, adversary case no. 25-03066 (the "**Adversary Proceeding**").

5.      As discussed below, on November 24, 2024, Debtors filed the Turnover Motion initiating the Contested Matter in the Bankruptcy Case. Participants then filed their Turnover Objection. In the Turnover Objection, the Participants disclosed that, following pre-litigation discovery under Rule 2004 of the Bankruptcy Rules ("**Rule 2004 Discovery**"), the Participants would commence a class action if the Rule 2004 Discovery established that such an action was supported by the relevant facts.  After some amount of the Rule 2004 Discovery, Participants filed such a class action, the Adversary Proceeding, on March 3, 2025, and immediately filed a motion to withdraw the reference of the Adversary Proceeding [Adv. P. No. 25-03066, Dkt. No. 3] (the "**Motion to Withdraw the Reference**"). The Motion to Withdraw the Reference has not yet been assigned to a District Court Judge.

6.      Concurrently with the filing of the complaint in the Adversary Proceeding and the Motion to Withdraw the Reference, Participants filed their *Emergency Motion of Certain Participants for an Order Staying the Contested Matter Relating to the Turnover Motion* [Case No. 24-90213, Dkt. No. 4089] (the "**Bankruptcy Court Motion to Stay**") seeking under Bankruptcy Rule 5011 to stay the hearing on the Turnover Motion that was set for March 11, 2025, until after the District Court was able to rule on Participant's Motion to Withdraw the Reference.

7.      The Bankruptcy Court heard the Bankruptcy Court Motion to Stay on March 7th, at which time the Bankruptcy Court ruled from the bench and denied the Bankruptcy Court Motion to Stay and reset the hearing on the Turnover Motion for March 26, 2025. The Bankruptcy Court has not yet entered a written order on the docket denying the Bankruptcy Court Motion to Stay.

8.      Participants file this motion to pursue their rights under Bankruptcy Rule 5011(d) to have the District Court enter a Motion to Stay in order to preserve this Court's ability to rule on the Motion to Withdraw the Reference.

## PARTICIPANTS SEEK TO HALT DEBTORS' ATTEMPT TO UNLAWFULLY SEIZE THEIR RETIREMENT FUNDS THROUGH A HURRIED PROCESS THAT PREJUDICES THEIR RIGHT TO A FULL AND FAIR TRIAL OF THEIR CLAIMS

9.      Participants are former employees of the Debtors, which filed for Chapter 11 relief on May 6, 2024. In their bankruptcy proceedings, the Debtors are attempting to unlawfully seize through an unreasonably expedited and prejudicial process over $60 million in retirement funds belonging to Movants and other deferred compensation plan participants—funds that the Debtors' employees earned and chose to defer for their future financial security.[3]

10.     For the reasons set forth in the class action complaint and the Turnover Objection, the funds the Debtors seek to take are not general corporate assets—they are the deferred earnings of employees, protected under ERISA. ERISA's protections are clear: funds held in deferred compensation plans presumptively belong exclusively to the employees who earned them and must be held in trust by the employer.

11.     The Debtors' unsupported and unsound argument to avoid the effect of this presumption is that these plans qualify as so-called "top-hat" plans, which would exempt them from ERISA's stringent protections, including that all plan assets are held in trust for the sole benefit of the plan participants and their beneficiaries. But that argument collapses under scrutiny. Top hat plans are a "rare species" of deferred compensation plan, and the burden of proving that this exception applies falls on the employer alleging top hat status. Under ERISA, a top hat plan must be unfunded

---

[3] At the outset of the chapter 11 case, the assets of the Plans consisted of various life insurance policies and other investments. By agreement of the Participants, the plan assets were monetized and the resulting funds are being held in segregated accounts and cannot be used or spent without an order of court or consent of the Participants. Under this agreement (the "**Monetization Stipulation**"), the rights of the Participants to claim the assets as held in trust for their exclusive benefit are expressly preserved.

and maintained exclusively for a *select group* of management or highly compensated employees—employees who, crucially, must have the sophistication and bargaining power to protect their own interests without ERISA's statutory safeguards. If a plan fails to meet any of these criteria, it cannot qualify for this rare exception, and the funds must remain protected under ERISA for the exclusive benefit of participants.

12.      Again, the burden to prove that the Debtors' Deferred Compensation Plans qualify as top-hat plans falls entirely on the Debtors. They have not—and cannot—meet this burden, because their plans fail the requirements for top-hat status at every level. First, the Debtors expanded eligibility far beyond a "select group," allowing participation from not just senior executives but also physicians, nurses, physician assistants, and even part-time employees—without consideration of their management responsibilities (if any). Second, eligibility was not limited to a select group of highly compensated employees. The level of compensation permitting eligibility was set far too low, which the Debtors have been aware of for years, permitting lower-compensated mid-level employees to participate on the same terms as higher-paid individuals. In addition, the Debtors ignored ERISA's core requirement of significant compensation disparity between eligible and ineligible employees; the subject deferred compensation plans here provide for virtually no disparity at all. Third, and equally critically, the employees deemed eligible lacked any meaningful bargaining power over the terms of or administration of the plans and lacked any knowledge of the Debtors' financial condition sufficient to protect themselves from risk—demonstrated by the fact that, even as the Debtors descended into admitted insolvency, the Debtors continued aggressively soliciting deferrals and re-deferrals without disclosing their insolvent condition and the Participants, in reliance on the Debtors' solicitations (and silence), continued to defer income. The Debtors' blatant disregard of ERISA's strict requirements and relevant safeguards confirms that these plans cannot be classified as legitimate top-hat plans.  The plans fail to meet the necessary selectivity requirements in all respects.

13.     Moreover, the Debtors treated the plans as if they were funded plans, not top hat plans. While admittedly insolvent—and by the written terms of the plans, barred from making distributions to participants and beneficiaries—the Debtors borrowed against the life insurance policies which were plan assets and made distributions to certain participants to whom payments were due (thus preferring them over the Debtors' creditors).  This conduct is completely, and legally, inconsistent with the plans being unfunded, is contrary to the terms that would make the plans unfunded and thus compels the legal conclusion that the plans were funded and not top hat plans. The fact that the distributions may have been made to mark the Debtors' insolvency is even worse.

14.     Finally, as noted above, the Debtors solicitation of deferrals while admittedly insolvent estops the Debtors from contending that the plans are top hat plans; the alternative is that the Debtors were committing fraud, and the appropriate equitable remedy in the face of that fraud would be to treat the assets as held in trust solely for the benefit of the Participants and their beneficiaries.  The same result follows regardless of the Debtors' intent: the assets of the Plan must be deemed in trust solely for the benefit of the Participants and their beneficiaries.

**THE BANKRUPTCY COURT HAS SET A MARCH 26, 2025 HEARING TO DECIDE WHETHER THE DEBTORS CAN SEIZE MOVANTS' RETIREMENT FUNDS, WHICH DOES NOT ALLOW THE PARTICIPANTS SUFFICIENT TIME TO PROPERLY PREPARE AND PRESENT THEIR CLAIMS**

15.     As noted above, the Debtors filed the Turnover Motion on November 24, 2024, seeking court approval to seize assets held in two deferred compensation trusts—the very assets employees had set aside for their future. The Debtors apparently want to use the money generated from the monetization of those assets to pay their lenders and bankruptcy professionals. On December 17, 2024, Movants filed their Turnover Objection, as noted above.

16.     On March 3, 2025, as expressly previewed and preserved in the Turnover Objection, the Participants filed a class action complaint (the "**Class Action Complaint**"), seeking equitable relief, including a ruling that the deferred compensation plans are not "top hat" plans and are therefore

6

subject to full ERISA protections and an equitable reformation of the underlying trusts to incorporate those protections (or alternatively, imposition of a constructive trust to the same effect). Alternatively, the complaint seeks an equitable surcharge forcing the Debtors' executives (as ERISA fiduciaries) to compensate Movants for the Debtors' executives' violations of ERISA and fiduciary breaches. At the same time, Movants filed the Motion to Withdraw the Reference, asking the District Court to adjudicate the Adversary Proceeding because the Adversary Proceeding requires the interpretation and application of only ERISA, not the Bankruptcy Code, thus making withdrawal of the reference mandatory. Movants simultaneously sought a stay of the Contested Matter to ensure that the Motion to Withdraw the Reference could be heard and decided by this Court, as the relevant statute requires. Granting the stay and withdrawing the reference would allow the District Court to take jurisdiction over the Adversary Proceeding and ensure a full trial on the merits of Movants' claims.

17.     On March 7, 2025, the bankruptcy court denied the stay and set the hearing on the turnover motion for March 26, 2025. By this motion, Movants ask this Court to impose a stay on the Contested Matter, and that hearing, so that Movants' Motion to Withdraw may be properly heard.

## THE BANKRUPTCY COURT'S RULING ON THE TURNOVER MOTION COULD UNCONSTITUTIONALLY PREEMPT THE DISTRICT COURT'S DECISION ON THE MOTION TO WITHDRAW THE REFERENCE

18.     First, action by the bankruptcy court on the Turnover Motion which would moot the Motion to Withdraw the Reference, when only this Court can decide the Motion to Withdraw the Reference, raises critical constitutional concerns.  Only this Court can decide the Motion to Withdraw the Reference; the bankruptcy court cannot do so, directly or indirectly.  As the Eleventh Circuit held, the bankruptcy court cannot take action, such as issuing an order dismissing the chapter 11 case, that preempts the district court's ruling on a motion to withdraw the reference without running afoul of Article III:

> Therefore, the district court did not err when it found that Article III barred the bankruptcy court from issuing a Section 305 order and granted the plaintiff's motion to withdraw the instant case from the bankruptcy

> court. The bankruptcy court exists to provide debtors and creditors with a specialized forum for the prompt and speedy resolution of bankruptcy proceedings. There is no question that they perform necessary and useful service by minimizing the dislocation suffered by individual debtors and creditors as well as the economy as a whole. Nevertheless, Congress has vested original jurisdiction over cases and proceedings under Title 11 in the district courts. The bankruptcy courts obtain jurisdiction over Title 11 cases or proceedings only by referral at the discretion of the district courts, and the district court may withdraw such reference for cause. As discussed above, this is not a hollow requirement. Nevertheless, the cause prerequisite should not be used to prevent the district court from properly withdrawing reference either to ensure that the judicial power of the United States is exercised by an Article III court in order to fulfill its supervisory function over the bankruptcy courts.

In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991). In the absence of the stay requested here, the bankruptcy court could enter a ruling on the Turnover Motion that preempts this Court's jurisdiction to decide the Motion to Withdraw the Reference. Article III considerations necessarily bar such action.

### A STAY OF THE HEARING ON THE TURNOVER MOTION IS WARRANTED UNDER THE GOVERNING LEGAL STANDARD

19.    Movants meet the straightforward standard set out for a party requesting a stay. "A bankruptcy court determining whether to stay proceedings [pursuant to Bankruptcy Rule 5011(c)] should consider: the likelihood that the Motion for Withdrawal of Reference will be granted; the harm to the movant if proceedings are not stayed; the harm to the other party if a stay is imposed; and the public interest." *In re Beach First Nat. Bancshares, Inc.*, No. ADV 10-80143, 2011 WL 2441501, at *1 (Bankr. D.S.C. Jan. 21, 2011). The moving party bears the burden of proof in demonstrating that a stay would be proper. *See id.; Sec. & Exch. Comm'n v. Pension Fund of Am., L.C.*, No. 05-20863, 2005 WL 8156247, at *2, (S.D. Fla. Nov. 7, 2005). Movants address each of these elements below.

### A.    Movants Are Likely to Succeed on the Motion to Withdraw the Reference (and on Their Underlying Claims)

20.    Movants are likely to succeed on their Motion to Withdraw the Reference because the claims at issue require substantial interpretation and application of federal non-bankruptcy law—

specifically ERISA, including the resolution of critical issues under ERISA not settled within the Fifth Circuit. Under 28 U.S.C. § 157(d), withdrawal of the reference is mandatory when resolving a case demands significant analysis of complex federal statutes beyond mere bankruptcy law, precisely the situation here. The heart of this dispute involves whether the Debtors' deferred compensation plans qualify as top-hat plans under ERISA, a determination requiring nuanced evaluation of ERISA's specialized requirements, detailed factual analysis, and application of federal caselaw addressing these very issues.

21.    28 U.S.C. § 157(d) provides, in pertinent part:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

22.    The statute does not prescribe what constitutes a "timely" motion.  Courts typically consider, among other things, prejudice to the parties and whether the resources of the parties and the court have been unfairly wasted during that delay.  *See, e.g.*, PNC Bank, Nat. Ass'n v. Fairburn, No. 4:13-MC-81, 2013 WL 5604362, at *2 (N.D. Ohio Oct. 11, 2013) ("[W]here unreasonable delay does not exist and the debtor suffers no prejudice, a court should not find a motion for withdrawal untimely.") (quotations omitted); In re C-TC 9th Ave. P'ship, 177 B.R. 760, 765 (N.D.N.Y. 1995) (motion for withdrawal was timely when filed four months after learning of underlying complaint, despite movant's filing dispositive motions in the interim); In re Texaco Inc., 84 B.R. 911, 919–20 (S.D.N.Y. 1988) ("[W]here there did not appear to be unreasonable delay and the debtors are not prejudiced by such a delay then a motion is not considered untimely." (citing Interconnect Telephone Services, Inc. v. Farren, (In re Interconnect Telephone Services), 59 B.R. 397, 402 (S.D.N.Y. 1986) (where a year had elapsed from the time the action was filed to the time the motion was made to

withdraw the reference, the court found the withdrawal motion was timely))). *See also* <u>Burger King Corp. v. B–K of Kansas, Inc.</u>, 64 B.R. 728, 730-31 (D. Kan. 1986) (debtors' motion to withdraw the reference was not untimely despite having been filed 10 months after the filing of their original motion, as such filing did not prejudice the position of the other parties to the action).  In addition, the Southern District of Texas has issued Gen. Order 2011-12 (S.D. Tex. Nov. 29, 2011), titled *In re Bankruptcy Jurisdiction*, which provides *inter alia* that motions to withdraw the reference with respect to adversary proceedings should be filed within ninety (90) days of the complaint.

23.    As the Motion to Withdraw the Reference was filed on the <u>same day</u> as the Class Action Complaint, it is timely under the express terms of General Order 2011-12.  As there is no indication that any party has been prejudiced by the filing of the Motion and it is indeed timely under the express terms of this Court's General Order, the Participants submit that the Motion is timely within the meaning of 28 U.S.C. § 157(d).[4]

---

[4] The Bankruptcy Court in denying the stay treated the Motion to Withdraw the Reference as pertaining to the Contested Matter.  The motion did not seek such relief.  But even if it had, the Motion to Withdraw Reference is also timely with respect to the Contested Matter.  Although Gen. Order 2011-12 provides that "[i]n a contested matter, a party should move to withdraw the reference within twenty-one days of the pleading initiating the contested matter," the Order clarifies that "[a] party's not having moved to withdraw the reference within these times does not waive a party's right to challenge the bankruptcy judge's authority."  Moreover, courts within the Fifth Circuit have interpreted that General Order to not "prohibit a party's ability to request withdrawal after the expiration of [the requisite period]." <u>In re Quality Lease & Rental Holdings, LLC</u>, No. 14-60074, 2016 WL 416961, at *4 (Bankr. S.D. Tex. Feb. 1, 2016), *report and recommendation adopted*, No. AP 14-6005, 2016 WL 11644051 (S.D. Tex. Feb. 29, 2016).  *See also* <u>In re Bay Area Reg'l Med. Ctr., LLC</u>, No. 19-70013, 2019 WL 13156596, at *2 (Bankr. S.D. Tex. Dec. 18, 2019), *report and recommendation adopted as modified sub nom.*, <u>Curtis v. Cerner Corp.</u>, No. 7:19-CV-00417, 2020 WL 1983937 (S.D. Tex. Apr. 27, 2020) ("Despite the 90-day window [prescribed by the General Order for when withdrawal motions *should* be filed with respect to adversary complaints], "a party may challenge the bankruptcy judge's authority at any time" (quoting the General Order)).

In addition, neither prejudice to the Debtors nor unfair delay exists with respect to the Turnover Motion (which has near complete overlap with the factual and legal analyses required by the Class Action Complaint and this Adversary Proceeding).  *First*, as set forth in the Turnover Objection, the Debtors bear the burden of proof on the Turnover Motion, so would have had to adduce evidence to satisfy their burden, whether before the District Court or the Bankruptcy Court.  The Debtors' efforts and time spent on the ongoing, rolling document production has thus been well-spent, and would have been required in any event.  *Second*, the Participants have worked diligently with the Debtors on the terms of the Monetization Stipulation and to resolve discovery disputes (some of which remain) since the filing of the Turnover Motion.  The Participants have thus not instigated any delay—to the contrary, they have worked productively with the Debtors and have facilitated that portion of the relief the Debtors sought which the Participants do not oppose. The Participants also previewed the possibility of a class action in the Turnover Objection.

24.    28 U.S.C. § 157(d) was part of the congressional response to <u>Northern Pipeline</u> <u>Construction Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50 (1982), which held unconstitutional the broad grant of jurisdiction given to bankruptcy judges under the Bankruptcy Code to hear and determine all matters arising under or related to Title 11.  *See* <u>Holland Am. Ins. Co. v. Succession of</u> <u>Roy</u>, 777 F.2d 992, 998 (5th Cir. 1985) (citing 28 U.S.C. § 157):

> … the Bankruptcy Amendments Act … was designed to narrow the delegation of authority to bankruptcy judges—that had resulted in invalidation of portions of the former bankruptcy regime—by, *inter alia,* authorizing the district courts to exercise all bankruptcy jurisdiction. As a concomitant of this authority, the Bankruptcy Amendments Act provided that each district court may refer to the bankruptcy judges 'any or all proceedings arising under Title 11 [the Bankruptcy Code] or arising in or related to a case under Title 11' … [and] may withdraw, in whole or in part, any case or proceeding referred under § 157 to the bankruptcy court, on its own motion or on timely motion of any party, for cause shown.

*See also* <u>In re Chateaugay Corp.</u>, 86 B.R. 33, 36 (S.D.N.Y. 1987) (providing similar historical explanation).

25.    The first sentence of 28 U.S.C. § 157(d) addressees so-called "permissive withdrawal," and the second sentence prescribes when withdrawal is mandatory.  Mandatory withdrawal can only be done on timely motion of a party, whereas permissive withdrawal may be effected on the court's own motion.  *See* 28 U.S.C. § 157(d).[5]

26.    Withdrawal is mandatory when a claim or defense entails "material and substantial consideration" of non-Bankruptcy Code federal law.  <u>Rodriguez</u>, 421 B.R. at 341, 347-48 (citations omitted); *see also* <u>In re Taxes & Beyond LLC</u>, Case No. 20-30735, 2020 WL 13789138, at *3 (Bankr. S.D. Tex. Dec. 11, 2020) (recommending withdrawal under mandatory section of statute because "this court will be required to apply the facts to the [non-bankruptcy] statutes in question, which will require

---

[5] That mandatory withdrawal can only be effected upon a party's motion is an important guardrail in avoiding too many issues being mandatorily withdrawn from bankruptcy courts.  *See, e.g.*, <u>In re Kiefer</u>, 276 B.R. 196, 200 (E.D. Mich. 2002) (disagreed with by <u>Rodriguez v. Countrywide Home Loans, Inc.</u>, 421 B.R. 341, 347-48 (S.D. Tex. 2009) on other grounds).

'material and substantial' consideration of non-bankruptcy laws."). To find that a claim involves "substantial and material consideration" of non-bankruptcy federal law, the court must find the claim will involve an interpretation of the federal law rather than the mere application of well-settled law. Rodriguez, 421 B.R. at 348 (citing In re Vicars Ins. Agency, Inc., 96 F.3d 949, 953–54 (7th Cir 1996)). Withdrawal is also mandatory "when the court must undertake analysis of significant open and unresolved issues regarding the non-title 11 law." Rodriguez, 421 B.R. at 348 (citing Vicars Ins., 96 F.3d at 954).

27.    In particular, if determination of what might appear at the surface to be a routine bankruptcy determination relies on a substantial and material analysis of non-bankruptcy federal law, withdrawal is still mandatory. See Chateaugay, 86 B.R. at 37 (finding withdrawal mandatory notwithstanding opponent's assertion that the underlying issues could "be resolved with reference only to § 362 of the [Bankruptcy] Code," since that opponent would have to rely on "an analysis of substantive ERISA provisions to support its position"); Great W. Sugar Co. v. Interfirst Bank, Dallas, N.A., No. CIV.A. 3-85-1755-H, 1985 WL 17671, at *2 (N.D. Tex. Nov. 7, 1985) (finding that disqualifying actions from mandatory withdrawal because they may qualify as "core" under 28 U.S.C. § 157(b)(2)(A), (E) and (O) would effectively gut mandatory withdrawal – "surely not a result intended by Congress"). Moreover, that determination of the underlying action might impede restructuring is irrelevant to a mandatory withdrawal analysis. See, e.g., In re Homeland Stores, Inc., 204 B.R. 427, 433 (D. Del. 1997).

   i.    *Adjudication of the Adversary Proceeding Requires Substantial and Material Interpretation of ERISA and Related Case Law*

28.    Adjudication of the Adversary Proceeding requires the Court to determine whether the Deferred Compensation Plans are so-called "top hat plans" exempt from the substantive protections of ERISA. This analysis requires substantial interpretation of several ERISA provisions

and federal courts' interpretations of those provisions and involves no meaningful bankruptcy analysis.

Chief among the material ERISA provisions that must be applied and interpreted are:

(a)    **29 U.S.C. § 1002(3),** defining "employee benefit plans" under ERISA;

(b)    **29 U.S.C. § 1051(2)**, exempting from the substantive requirements of ERISA any plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees";

(c)    **29 U.S.C. §§ 1081(a)(3), 1101(a)(1)**, exempting the type of plan described in 29 U.S.C. §§ 1051(2) from ERISA's participation, vesting, funding and fiduciary requirements;

(d)    **29 U.S.C. § 1103(c)(1) and the "exclusive benefits rule,"** prescribing that the assets non-exempt plans shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants;

(e)    **29 U.S.C. § 1056(d)**, protecting plan assets by preventing voluntary or involuntary transfer or alienation; and

(f)    **29 U.S.C. § 1132(a)(3)**, prescribing equitable remedies available for ERISA violations.

29.    The determination as to whether a deferred compensation plan is a "top hat" plan turns on (among other things) whether it was sufficiently selective under 29 U.S.C. § 1051(2). Whether a deferred compensation plan is sufficiently selective to qualify as a "top hat plan" is a detailed factual and legal analysis involving several qualitative and quantitative factors, each prescribed by federal courts interpreting ERISA. *See* Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.), 387 B.R. 95, 110 (Bankr. D. Del. 2008). Among those factors are: "(1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)." Tolbert v. RBC Capital Markets Corp., No. CIV.A. H 11-0107, 2015 WL 2138200, at *9 (S.D. Tex. Apr. 28, 2015) ("**Tolbert II**"). *See also* Browe v. CTC Corp., 15 F.4th 175, 194 (2d Cir. 2021) (explaining that

courts must consider quantitative and qualitative factors when analyzing whether a plan is "maintained primarily for a select group of management or highly compensated employees" (quoting 29 U.S.C. § 1051(2))).

30.     Withdrawal of the reference with respect to the Adversary Proceeding is therefore mandatory under 28 U.S.C. 157(b) because resolution of the issues presented requires substantial and material consideration of federal non-bankruptcy law.  *See* Rodriguez, 421 B.R. at 348; Vicars Ins., 96 F.3d at 954.

### ii.    *Adjudication of the Adversary Proceeding Requires More Than Mere Application of Settled Law Under ERISA and Will Invoke the Equitable Powers of the District Court*

31.     Determining if a plan is a top hat plan involves a ***fact-specific and fact-intensive inquiry***.  As the statute and relevant guidance from the Department of Labor requires, and consistent with the rationale for the exception, an apparent majority of courts look at three distinct and indispensable requirements, as to all of which the party asserting that the plan is a top hat plan has the burden of proof.  To be designated a "top hat" plan, ERISA requires the court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees"; and (3) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply."  Guiragoss v. Khoury, 444 F. Supp. 649, 658-659 (E.D. Va. 2006) (emphasis supplied).  *See also* Bakri v. Venture Mfg Co., 473 F. 3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a top hat plan); Alfa Laval, Inc. v. Nichols, Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) (citing three-part analysis); Carrabba v. Randalls Food Market, Inc., 38 F. Supp. 2d 468, 476-78 (N.D. Tex. 1999) (citing three-part test and finding plan not a top hat plan).  The burden is on the party seeking to establish top hat status to prove all of

the elements. Defendants bear the burden of proving that the [ERISA] Plan is a top hat plan." Browe v. CTC Corp., 331 F. Supp. 3d 263, 294 & n.8 (D. Vt. 2018), aff'd in part and vacated in part on other grounds, Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021); see also Daft v. Advest, Inc., 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer typically bears the burden of proof on this issue in the district court"); MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of showing that the Plan is a top hat plan"); Deal v. Kegler Brown Hill & Ritter Co. L.P.A., 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant to show that the ... Plan is a top hat plan"); Alexander v. Brigham & Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), aff'd, 513 F.3d 37 (1st Cir. 2008) (noting that defendant "has the burden of proving that [deferred compensation plans] were each top hat plans"); Virta v. DeSantis Enters., Inc., 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on this affirmative defense"); In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008) ("The burden of establishing the existence of a top hat rests on the party asserting that it is a top hat plan."); Carrabba v. Randalls Food Mkts., Inc., 38 F. Supp. 2d 468, 476-78 (N.D. Tex. 1999) (stating that it was defendant's burden to prove ERISA plan was a top hat plan and holding that defendant failed to meet that burden despite evidence that the plan was intended to be a top hat plan). But see Sikora v. UPMC, 876 F.3d 110, 113 (3d Cir. 2017). A failure to prove any element mandates a finding that the plan is not a top hat plan.

32. Other courts, when analyzing the "selectivity" requirement, consider whether the participants in a deferred compensation plan had a "substantial influence" over the particular "terms and provisions of the plan, such that they did not need the full panoply of protections provided by

ERISA" as one of the considerations to be weighed and balanced in determining selectivity rather than as a standalone and separate required element. Tolbert II, 2015 WL 2138200, at *5-8 (collecting cases and leaning toward position that the "substantial influence" factor is part of the selectivity analysis without deciding point). Thus, for these courts, ability to influence the plan, knowledge and bargaining leverage is part of the second of only two required elements. Which approach to follow will be a decision for the District Court in this case, although the Participants believe the Deferred Compensation Plans fail to qualify as top hat plans under either approach. Given the Participants' complete lack of leverage or influence, adoption of the majority approach of Carrabba will be outcome determinative. As noted, two federal district courts in Texas have arguably taken different approaches to this issue.

33.    In addition, a finding that the Deferred Compensation Plans are not top hat plans will necessitate an equitable remedy, thus invoking the equitable powers of the District Court and the necessary remedy-defining discretion that goes with it. If the Deferred Compensation Plans fail to qualify as top hat plans, the assets of the Deferred Compensation Plans are and always were subject to a prior ERISA statutory trust, which trust attached before any deposit of the Participants' deferrals (or assets funded thereby) into the rabbi trust. See 29 U.S.C. § 1103(a) (which requires that all benefit plan assets must be maintained in trust). Each of the Deferred Compensation Plans is undeniably an "employee benefit plan" under ERISA since it provides for deferred compensation and retirement benefits. 29 U.S.C. § 1002(3). Referring to 29 U.S.C. § 1103(a), the Third Circuit was unequivocal: "Therefore, ERISA plan funds are, as a matter of law, 'held in trust' and are not available to the employer for general use. Our case law . . . treats employee benefit plan funds as trust funds." Pell v. E.I. DuPont De Nemours & Co., 539 F.3d 292, 309 (3d Cir. 2008).

34.    Where ERISA's substantive provisions apply, from the very moment funds are withheld from employee compensation (i.e., not paid to the employee despite being earned) to fund

an ERISA-qualified benefits or pension plan, such amounts are held in trust for the employee beneficiaries and cannot become property of a debtor's estate. *See* In re Lenox Healthcare, Inc., 343 B.R. 96, 102 (Bankr. D. Del. 2006) (explaining that "employee contributions never became property of the estate but were always property of the employees held in trust by the Debtor"); In re Lexington Healthcare Grp., Inc., 335 B.R. 570, 576 (Bankr. D. Del. 2005) (imposing a trust upon employee wages withheld for the benefit of an ERISA-qualified plan). As recognized by Judge Walrath in In re The IT Group, Inc., 305 B.R. 402, 407 (Bankr. D. Del. 2004), and by the Third Circuit in Pell, assets in an employee benefit plan or accompanying trust cannot ever become assets of the employer's bankruptcy estate, unless an exception contained within ERISA is established. *See* IT Grp., 305 B.R. at 407 (stating that an ERISA trust would not apply if and only if the requirements for proving the top hat exception for ERISA's substantive protections are established); Pell, 539 F.3d at 309 (holding that "ERISA plan funds are, as a matter of law, 'held in trust,' and are not available to the employers for general use"). *See also* Patterson v. Shumate, 504 U.S. 753, 758, 765 (1992) (holding that any interest in a plan or trust that contains a transfer restriction enforceable under any relevant non-bankruptcy law is excluded from the debtor's estate). Even if a statutory trust did not attach, a constructive trust could easily be imposed; the fund is identified and segregated as set forth in the Turnover Motion. *See* Leckey v. Stefano, 501 F.3d 212, 230 (3d Cir. 2007) (stating that a constructive trust may be available when the "disputed assets are in an intact, traceable fund").

35.    Thus, unless and until the Debtors meet their evidentiary burden of proving each of the elements of the "top hat" exclusion, ERISA's substantive provisions apply. *See, e.g.*, New Century, 387 B.R. at 101, 110. As a consequence, all of the assets in the rabbi trusts necessarily are held in trust for the Participants. *See* 29 U.S.C. § 1103(a). *See also* IT Grp., 305 B.R. at 407; Pell, 539 F.3d at 309. If the substantive provisions of ERISA apply to the plans, then the contributions of the Participants

17

to the rabbi trust have been held in trust since the moment they have been deferred or withheld from pay. *See* Lexington Healthcare Grp., 335 B.R. at 576.

36.     Additionally, even if not automatically in trust, under ERISA, a participant or beneficiary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). In CIGNA Corp. v. Amara, the United States Supreme Court confirmed, without qualification, that "Section 502(a)(3) invokes *the equitable powers of the District Court*." 563 U.S. 421, 442 (2011) (emphasis supplied). Once invoked, "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." Brown v. Plata, 563 U.S. 493, 538 (2011) (internal quotation omitted). *See also* Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 12 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); Leckey, 501 F.3d at 229-30 (equitable relief under § 1132(a)(3) is available to redress any violation of ERISA); Delgrosso v. Spang & Co., 769 F.2d 928, 937 (3d Cir. 1985) ("A federal court enforcing fiduciary obligations under ERISA is thus given broad equitable powers to implement its remedial decrees.").

37.     As the Supreme Court noted in Amara, declaratory relief, injunctions, surcharge, restitution, imposition of resulting or constructive trusts, and reformation of the plan and trust are among "those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity" and all are forms of "appropriate equitable relief" that may be properly pursued under 29 U.S.C. § 1132(a)(3). Amara, 563 U.S. at 439-41 (internal quotations omitted). The claims asserted by the plaintiff are based on these categories of relief the Supreme Court has approved

as appropriate for seeking relief under ERISA § 1132(a)(3).  *See* id.; New Century, 387 B.R. at 108

("Plaintiffs appropriately bring their claims under ERISA's civil enforcement provisions.").

38.    When an alleged top hat plan fails to qualify, the required equitable relief is plan-wide

and is ***not*** limited to participants who were ineligible to participate.  *See* Carrabba v. Randalls Food

Markets, Inc., 145 F. Supp. 2d 763, 772 (N.D. Tex. 2000), *aff'd*, 252 F.3d 721 (5th Cir. 2001) (in case

of a failed top hat plan: "The court is not persuaded that equity compels exclusion from recovery in

this action of those participants in the [plan] who could have properly been included as participants

in a top hat plan.").  The relief to be granted should put the participants in the same place as if the

employer had complied with all applicable protections of ERISA.  Id. at 775-76.  Reformation of the

plan and trust is particularly appropriate plan-wide relief.  *See, e.g.*, Guenther v. BP Retirement

Accumulation Plan, No. 4:16-CV-00995, 2021 WL 1216377, at *9 (S.D. Tex. Mar. 12, 2021).  *See also*

Amara v. CIGNA Corp., 925 F. Supp. 2d 242, 250-55 (D. Conn. 2012) (ordering the reformation of

a pension plan), *aff'd*, 775 F.3d 510 (2d Cir. 2014).

39.    Withdrawal of the reference with respect to the Adversary Proceeding is therefore

mandatory because its resolution requires "analysis of significant open and unresolved issues regarding

the non-title 11 law," *see* Rodriguez, 421 B.R. at 348 (citing Vicars Ins., 96 F.3d at 954), and triggers

invocation of the District Court's broad equitable powers (and its considerable discretion in applying

them and shaping relief).  *See* Taxes & Beyond, 2020 WL 1378913 at *3. [6]

40.    Additionally, Movants are likely to prevail on their underlying claims. The Deferred

Compensation Plans fail critical ERISA requirements for top-hat status. The Plans included a broad

range of employees—not just senior executives or highly compensated management, but many mid-

level professionals and employees lacking bargaining power over the terms of the Plans or their

---

[6] The Debtors also apparently challenge the majority rule that the party claiming top hat status has the burden of proof on all necessary elements thereof.  Carraba, 38 F.Supp.2d at 477-478.  There, the district court will need to resolve that issue as well.

employment terms. The Debtors, despite their precarious financial condition, continued actively soliciting employee contributions, withholding critical information about their insolvency from participants who depended on these plans for retirement security. The Debtors treated the plans as funded, not unfunded plans. <u>Megasrevy v. Retirement Committee</u>, 2016 WL 1321406 (S.D. Fla. April 5, 2016).

**B.    <u>Movants Will Be Irreparably Harmed if the Proceedings Are Not Stayed.</u>**

41.    Denying this Motion would cause Movants irreparable harm. If the Turnover Motion is heard on March 26, 2025, as presently scheduled, Movants face the imminent and irreversible loss of their own earned compensation. These funds are not discretionary bonuses, stock options, or contingent benefits. They are wages already earned through labor—compensation that, under normal circumstances, would have been paid directly to Movants, taxed, and available for their personal use. Instead, Movants voluntarily deferred this income, trusting that it would grow in value while tax-deferred, providing financial security in retirement.

42.    Now, however, the Debtors seek to confiscate these assets entirely, treating Movants' deferred earnings as estate property and funneling them to their lenders and bankruptcy professionals rather than the rightful owners.

43.    If the truncated Turnover Motion hearing were to go forward and be granted without the Participants having a fair opportunity to oppose it, their hard-earned, deferred compensation will be gone forever. Movants cannot recover them by refiling claims or waiting in line with other creditors because the Debtors are likely administratively insolvent. The bankruptcy process offers no path to restitution—there is no viable scenario in which these employees would ever recover their wages if they were wrongfully swept into the Debtors' estates. Once within the estate, these funds will be irretrievably spent, allocated to lenders and bankruptcy professionals. The result would be as simple as it is unjust: the employees who earned this money will receive nothing, before this Court properly

has an opportunity to adjudicate the class action—even though it is the only court that can properly do so under the applicable law. This is not merely an unfair outcome—it is a fundamental violation of the purpose of ERISA and the most basic expectations of justice.

44.     The irreparable nature of this harm cannot be overstated. If a stay is denied and these funds are transferred without the legal issues being fully and fairly adjudicated by this Court, no future court ruling can undo the damage. No subsequent judgment or award can restore what has already been distributed and spent. There is no "second chance" for Movants to reclaim their earnings. The very purpose of a stay is to prevent precisely this kind of irreversible harm—to preserve the status quo while this Court determines the true legal ownership of these funds. If the funds remain in a segregated account while litigation proceeds, then, even if Movants ultimately lose, the Debtors will receive their funds at a later time with no lasting harm to them. But if the stay is denied and the Turnover Motion proceeds and is granted based upon a hastily-scheduled hearing, Movants could suffer a total and final loss of their deferred compensation, with no avenue for recovery, before this Court has an opportunity to rule.

45.     The Participants' need for additional time to fully and fairly prepare for trial—and, hence, the need for a stay—was compounded by the Debtors' persistent obstruction and delay in fulfilling their discovery obligations. From the outset of the Contested Matter, Movants have sought critical documents to properly evaluate the causes of action against the Debtors and the fiduciaries with respect to the plans. These materials include financial records, compensation data, governance documents, and internal communications—each essential to proving that the deferred compensation plans do not qualify as top-hat plans and that the plan assets should remain protected under ERISA. However, despite repeated and diligent efforts, Movants have been met with nothing but delay tactics from the Debtors.

46.     Movants first requested these documents in a timely manner under a Rule 2004 Notice, yet the Debtors have engaged in a pattern of delay by producing documents in small, piecemeal batches—often incomplete, untimely, or provided so close to critical deadlines that effective use was nearly impossible. For example:

> • January 9, 2025 – Movants held a meet-and-confer with Debtors to emphasize the need for key documents, yet no production was forthcoming.

> • January 21, 2025 – Movants followed up on their requests, as they had still received no documents since the January 9 meet-and-confer.

> • January 22, 2025 – Debtors responded vaguely, stating they were "in the process" of collecting information but provided no firm timeline. That same day, they produced only 64 pages of liabilities and plan asset cash value—far from what was requested.

> • January 28, 2025 – Another meet-and-confer was held. Debtors' special ERISA counsel stated that they "hoped" to produce certain prioritized documents by January 31, 2025, but might not complete production until February 7, 2025—with no actual commitment to produce all necessary materials.

> • February 13, 2025 – At Movants' urging, another meet-and-confer took place. Prior to the meeting, Movants provided a list of key missing documents, which still had not been produced.

> • February 17, 2025 – On Presidents' Day weekend, Debtors made another partial production, but it still failed to include complete materials from any single category requested.

> • March 1 to March 5, 2025 – With the hearing now mere weeks away, Debtors suddenly produced over 3,000 documents in multiple tranches—1,514 on March 1; 1,623 on March 4, and a small batch of 9 on March 5.

> • March 7 to March 12, 2025 – After the hearing on March 7, Debtors made three additional productions, including two productions of 1 document each, and one production of 1,222 documents. Debtors have stated that their document production is complete.

47.     The timing of these productions is deeply prejudicial if the Participants are forced to proceed on March 26. The bulk of Debtors' discovery responses have arrived less than three weeks before the now-rescheduled evidentiary hearing, leaving Movants with an impossible task: reviewing

thousands of pages of documents, analyzing financial data, identifying key witnesses, preparing expert testimony, and deposing multiple individuals—all within days. This is a textbook example of a party using discovery delays to gain a procedural advantage.

48.     Worse still, Debtors have consistently refused to provide the names and contact information of the very individuals responsible for administering the deferred compensation plans. Movants asked multiple times for the names, titles, and contact details of board and committee members overseeing the plans. Yet, until this week, the Debtors had only provided the names of vice presidents of human resources, failing to identify any board or committee members. Accordingly, these individuals were listed as John/Jane Doe defendants in the Class Action Complaint. Without this basic information, Movants have been effectively blocked from taking timely depositions necessary to challenge Debtors' claims.

49.     The delay tactics have left Movants in an untenable position:

• No depositions have been conducted.

• No experts have been retained, much less reports finalized. The rushed timeline has made it impossible to properly consult with experts and incorporate their findings into the case.

• Thousands of documents remain unreviewed. With just days left, Movants must analyze an avalanche of last-minute productions while simultaneously preparing for a major evidentiary hearing.

50.     The Debtors' strategy is transparent: delay and withhold discovery long enough that Movants are forced into an unbalanced and unfair hearing rather than allowed to proceed with the more orderly prosecution of the class action. The law does not allow parties to use procedural maneuvering to avoid scrutiny and gain a tactical advantage, yet that is precisely what is happening here. A stay is not merely appropriate—it is essential. If this hearing proceeds as scheduled, Movants will be forced to litigate blindfolded, without adequate time for discovery, including depositions,

expert retention, or adequate preparation time. Meanwhile, Debtors—who created this discovery logjam—will reap the benefits. This is not due process.

51.     The purpose of a stay is to prevent precisely this kind of injustice. If a stay is granted, the funds at issue will remain in a segregated account, ensuring that neither party is harmed while the legal questions are resolved by this Court, as required. But if the stay is denied and the hearing on the Turnover Motion proceeds, Movants will be thrust into a hearing without the tools necessary to fairly present their case— jeopardizing their ability to recover their earned compensation. The Court should not allow Debtors to use discovery misconduct as a backdoor strategy to seize funds that do not belong to them.

**C.    Any Harm the Debtors Might Suffer if the Proceedings Are Stayed Pales in Comparison to the Harm the Participants Will Suffer if the Stay is Denied.**

52.     The Debtors will not be harmed by granting the stay and allowing the Participants a fair opportunity to demonstrate that the money the Debtors seek is not part of the bankruptcy estate. Participants contend that the assets of the Deferred Compensation Plans rightfully belong to employees who earned them through their labor and service. The Debtors' entire strategy hinges on using someone else's earnings to satisfy obligations to their lenders and professionals—an outcome that would be unjust and fundamentally inequitable.

53.     Moreover, with the Participants' cooperation and agreement, the Debtors have previously entered into a binding stipulation ensuring that these disputed assets remain safely segregated, untouched, and protected until a final determination of ownership is reached. Thus, granting a stay would not irreversibly transfer these assets to the Participants or to anyone else. It would simply maintain the status quo and allow adequate time for this Court to properly assess and rule upon the merits. If, at the end of litigation, the Debtors prevail and are ultimately found to have legal rights to these funds, those assets will still be readily available in the segregated accounts.

Therefore, any claim by the Debtors that they are harmed by the granting of a stay amounts merely to a complaint about delay—nothing more.

54.      Debtors will contend that they need this money to "emerge" from chapter 11 and to complete their plan.  But the Debtors' chapter 11 cases are essentially liquidations; most of the Debtors' hospitals were sold, the rest closed.  The Debtors have even sold their right to provide transition services to the buyers of those hospitals.  The Debtors' need for liquidity to finalize their failed cases is not the responsibility of their employees, including the nurses and doctors who tended to patients and saved lives while the hospitals were driven to insolvency.  And the Debtors are not out of money solely because they are unable to appropriate the deferred compensation plan assets at issue in these cases; they are out of money due to a multitude of reasons having nothing to do with the Participants or the assets in question here.

**D.      Granting the Stay Serves the Public Interest.**

55.      Public interest weighs heavily in favor of granting the stay. At its core, this case concerns whether an employer can evade federal protections designed to safeguard employees' deferred compensation—money that belongs to workers, not corporate creditors. The decision in this case will have ramifications far beyond these Movants. If the Debtors succeed in taking these funds under the guise of a hurried bankruptcy proceeding that does not afford the Participants due process, it will send a dangerous signal to employers nationwide that they can misuse and repurpose employee compensation, secure in the knowledge that they can later claim those funds as part of their bankruptcy estate. This Court should reject such a precedent and recognize that ERISA's safeguards exist precisely to prevent this type of misconduct.

56.      Congress enacted ERISA to protect employee retirement and deferred compensation funds from exactly this kind of employer mismanagement and abuse. If the stay is denied and the Debtors are allowed to proceed with their Turnover Motion before the proper legal questions are fully

resolved by this Court (the only Court that can determine the issues), it would undermine public confidence in ERISA's protections and incentivize other struggling employers to raid employee funds under the guise of financial restructuring. Such an outcome would erode the fundamental purpose of ERISA—to ensure that employees, not corporate creditors or bankruptcy professionals, benefit from the compensation they have rightfully earned.

57.    Moreover, denying the stay would undermine trust in the integrity of the judicial process. The Movants have presented serious legal and factual disputes that warrant full and fair adjudication in the class action. If the Court denies the stay and these funds are subsequently transferred and spent, Movants may never recover what is rightfully theirs. The justice system does not serve the public interest when it allows irreversible harm to occur before the legal process runs its proper course, which, in this case, requires adjudication by this Court.

### EXPEDITED RELIEF IS NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM

58.    Movants request expedited consideration of this motion, as the hearing on the Debtors' Turnover Motion is scheduled for March 26, 2025—just under two weeks away. Without prompt intervention by this Court, Movants will be forced to litigate under conditions that severely prejudice their ability to present their case. The urgency of this request is not of Movants' making; it is the direct result of the Debtors' deliberate delay tactics.

59.    For months, Movants have sought critical discovery, yet the Debtors withheld key documents, failed to provide complete responses, and slow-walked production until the last possible moment. Only within the last two weeks did the Debtors suddenly produce more than 3,000 documents, leaving Movants scrambling to review and analyze them in the limited time remaining. The Debtors have also failed to identify key witnesses involved in the administration of the deferred compensation plans, preventing Movants from taking the depositions needed to test the Debtors' claims. Now, the Debtors intend to proceed with a hearing where Movants have had no meaningful

opportunity to prepare expert testimony, depose critical witnesses, or fully analyze the late-produced documents.

60.    Expedited relief is necessary to prevent the Debtors from using procedural manipulation to their advantage. The Debtors delayed discovery to create an artificial time crunch and now seek to capitalize on that delay by forcing Movants into an evidentiary hearing without the ability to fully develop the record. This is not due process. It is an effort to obtain a rushed decision on an incomplete factual record while shielding their own assertions from scrutiny. The Court should not allow the Debtors to benefit from their own obstruction.

61.    Movants respectfully request that the Court enter an expedited briefing schedule and issue a ruling as soon as practicable to ensure that their rights are protected before the March 26, 2025, hearing.

### <u>RESERVATIONS OF RIGHTS</u>

62.    The Participants reserve all rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion.

WHEREFORE, for the reasons set forth herein, Movants respectfully request that this Court stay the hearing on the Turnover Motion pending the District Court's adjudication of the Motion to Withdraw the Reference and, whether or not the reference is withdrawn, pending adjudication of the Adversary Proceeding.

Dated:  March 13, 2025    */s/  Allan B. Diamond*    
            Allan B. Diamond, Esq.
            Christopher D. Johnson, Esq.
            Diamond McCarthy, LLP
            909 Fannin Street, 37th Floor
            Houston, TX  77010
            Telephone: (713) 333-5100
            Facsimile: (713) 333-5199
            Email:  allan.diamond@diamondmccarthy.com
              chris.johnson@diamondmccarthy.com

            Robert J. Keach, Esq., *admitted pro hac vice*
            Lindsay K. Milne, Esq.
            **BERNSTEIN, SHUR, SAWYER & NELSON**
            100 Middle Street
            P.O. Box 9729
            Portland, ME  04104-5029
            Telephone: (207) 774-1200
            Facsimile: (207) 774-1127
            Email:  rkeach@bernsteinshur.com
              lmilne@bernsteinshur.com

            *Counsel for the Participants*